[Cite as *State v. Muncy*, 2017-Ohio-121.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellant | : | Appellate Case No. 27146 |
| | : | |
| v. | : | Trial Court Case No. 15-CR-3603 |
| | : | |
| DAVID A. MUNCY | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellee | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 13th day of January, 2017.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by LYNNE R. NOTHSTINE, Atty. Reg. No. 0061560, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellant

KRISTINE E. COMUNALE, Atty. Reg. No. 0062037, Law Office of the Public Defender, 117 South Main Street, Suite 400, Dayton, Ohio 45422
      Attorney for Defendant-Appellee

. . . . . . . . . . . . .

HALL, J.

{¶ 1} The State of Ohio appeals, pursuant to R.C. 2945.67(A) and Crim.R. 12(K), from the trial court's decision, order, and entry sustaining in part defendant-appellee

David A. Muncy's motion to suppress evidence.

{¶ 2} In its sole assignment of error, the State contends the trial court erred in suppressing drugs found in a locked desk drawer in Muncy's house. It also claims the trial court erred in suppressing subsequent statements from Muncy as "fruit of the poisonous tree."

{¶ 3} The facts underlying the present appeal are derived from suppression-hearing testimony. The trial court summarized that testimony in its ruling as follows:

> City of Dayton Police Sgt. John Riegel ("Riegel") testified that on July 6, 2015, he and another officer investigated a complaint of alleged drug activity at a duplex located at 222-224 McPherson Street in Dayton. According to Riegel, Defendant David A. Muncy ("Defendant") and his elderly mother lived in the 222 side of the duplex and used the 224 side for storage. Riegel and Officer Jordan Alexander ("Alexander") initiated contact with Defendant by knocking on the door of 222 McPherson. Riegel testified that he saw Defendant walk from [the] living room to another room of the house prior to Defendant's mother answering the door.

> Riegel testified that he explained to Defendant's mother that he and Alexander were there because complaints had been made about drug sales at the house, and he asked if they could come in and look around. According to Riegel, Defendant's mother let them in the house and gave verbal consent for them to "look around." Riegel and Alexander performed a cursory search of the home, both upstairs and downstairs, as well as the 224 side of the duplex. The cursory search did not include opening drawers

or closet doors. The officers encountered Defendant sitting at a desk in [a] room on the first floor. Riegel testified that on the desk, in plain sight, was a notebook with writing that appeared to Riegel to be [a] drug ledger as it detailed numbers and dollar amounts.

According to Riegel, because he suspected the notebook was a drug ledger, he asked Defendant for consent to search the desk. Riegel testified that Defendant gave verbal consent. One drawer was locked, and Riegel asked for the key, which Defendant told him he didn't have. Riegel repeatedly asked for the key. According to Riegel's cross examination testimony he made the statements to the effect of the following several times:

I believe you have drugs in there.

I believe you have the key.

I want you to open it.

I want you to give me the key.

Eventually, Defendant produced a key to the drawer, and Riegel opened it and found contraband. Riegel testified that he made no promises or threats to Defendant. Riegel then read Defendant his Miranda rights, and Defendant agreed to answer Reigel's questions. Defendant was not arrested that day.

Defendant then testified. According to Defendant, he was also at the door when his mother opened it for the officers. He testified that when Riegel asked to come in and look around, Defendant was reluctant and said

he would prefer not, but to go ahead. Defendant also testified that he told Riegel that he would rather that Rigel not look in the locked drawer, but to go ahead. Defendant stated that he was concerned that if he did not cooperate with Riegel by giving him the key to the drawer and answering his questions that Riegel would get a warrant and Defendant's elderly mother may be taken to jail.

(Doc. # 17 at 1-2).

{¶ 4} Based on the foregoing testimony, the trial court found the officers' warrantless entry into the residence and their cursory search permissible, noting that Muncy had given voluntary consent. The trial court next concluded that the suspected drug ledger was observed in plain view. With regard to the search of the desk, the trial court reasoned:

Defendant also testified that he further told Riegel that he could look in the desk drawers, all but one of which was unlocked. This Court finds that verbal permission was given to the officer to search the unlocked drawers. This permission did not extend, however, to the locked drawer. * * *

In the case at bar, there is evidence that Defendant knew that the drawer containing the contraband was locked when he consented to the search of the desk, and he denied having a key several times when asked. Both Riegel and Defendant testified that Riegel asked for the key several times and indicated that he knew Defendant had the key. Riegel credibly testified that he did not make any threats or promises to the Defendant to obtain the key. The Court notes, however, that Defendant's elderly mother

was present during the search, and it is reasonable, as he testified, that he would have been concerned about her welfare in the event that contraband was found by the police. Under the totality of the circumstances, the Court finds that Defendant did not voluntarily consent to the search of the locked drawer and all evidence seized therefrom must be suppressed.

After the contraband was located in the locked drawer, Defendant was properly [M]irandized and agreed to answer questions from the officers. These statements, however, are fruit of the poisonous tree because the interrogation was not sufficiently distinguishable to be purged of the primary taint. * * *.

(*Id.* at 4-5).

{¶ 5} On appeal, the State challenges the trial court's finding that Muncy did not voluntarily consent to the search of the locked desk drawer. In particular, the State contends the trial court erred in finding that Muncy's consent to search the desk did not extend to the locked drawer. The State also contends the trial court erred in finding that Muncy did not voluntarily consent to turn over the key to the drawer. The State points out that the trial court credited Riegel's testimony that he did not threaten Muncy or promise him anything to obtain the key. The State then reasons:

Despite believing Riegel's testimony, the trial court reached the untenable conclusion that Muncy's decision to provide the key to the drawer was involuntary. The totality of the circumstances, as established by Riegel's credible testimony, shows that just the opposite is true: no explicit

duress or coercion was used by the officers to obtain the key to unlock the lap drawer. Muncy might have been concerned about his mother's welfare, as the trial court found, but that concern did not come from the words or actions of the officers. Where there is no credible evidence that the officers used duress or coercion to obtain the key to the lap drawer, the trial court's finding that Muncy's decision to hand over the key was involuntary should be overruled by this Court.

(Appellant's brief at 8-9).

{¶ 6} Upon review, we find the State's argument to be unpersuasive. Whether consent to search is voluntary is a question of fact to be determined by the trial court from the totality of the circumstances. The State bears the burden of proving by "clear and positive evidence" that consent was not the product of duress or coercion, express or implied. *State v. Ingram*, 82 Ohio App. 3d 341, 347, 612 N.E.2d 454, 458 (2d Dist.1992). Both "the Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force. For, no matter how subtly the coercion was applied, the resulting 'consent' would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed." *Schneckloth v. Bustamonte*, 412 U.S. 218, 228, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854, 863 (1973).

{¶ 7} In the present case, we agree with the State that Muncy consented to a search of the entire desk which did not exclude the locked drawer. Indeed, he and Riegel both testified that he gave the officers permission to search the locked drawer. (Tr. at 26-27, 42, 51, 53). He did so, however, because he knew the drawer was locked, a fact the

officers themselves quickly discovered, and correctly believed the officers would be unable to open the drawer without a key, which he withheld and denied possessing. (*Id.*). Thus, although the State disputes the trial court's finding that Muncy's verbal consent did not extend to the locked drawer, the critical issue is whether Muncy voluntarily consented to turn over the key that enabled the officers to search the drawer.

{¶ 8} On that issue, the State points to the trial court's factual finding that Riegel did not make any "threats or promises" to get Muncy to provide the key. As noted above, however, consent also may be subtly coerced by implicit means. *Schenckloth* at 229 ("In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents."). Here the trial court's factual findings support a determination that Muncy did not voluntarily consent to turn over the key that enabled the officers to open and search the locked drawer. Most critically, the trial court noted in its factual findings and in its legal analysis that Riegel asked for the key several times and that Muncy denied having it several times. (Doc. # 17 at 2, 4). In particular, the trial court noted that Riegel repeated statements including "I want you to open it" and "I want you to give me the key." (*Id.* at 2).

{¶ 9} Muncy's initial denials of having a key and his initial refusals to turn over the key demonstrate that he did not want to give up the key, likely because he knew drugs were inside the locked drawer. That fact supports a finding that his eventual decision to give Riegel the key was involuntary and not the product of his own free will. Instead, his decision to hand over the key appears to have been the product of police coercion in the form of Riegel's repeated requests, which reasonably may have been perceived under

the circumstances as a demand.

{¶ 10} This court reached a similar conclusion in *State v. DeCaminada*, 148 Ohio App.3d 213, 2002-Ohio-2917 (2d Dist.). In that case, a police officer approached a woman seated in a parked car. When he initiated contact with her, she "made a furtive movement with her left hand down between the door and the driver's seat[.]" *Id.* at ¶ 7. As he interacted with the woman, the officer noticed a pill bottle in the area where she had reached. The officer asked what the pills were, and the woman denied possessing any pills. *Id.* at ¶ 15. The woman then refused when the officer asked her to hand him the bottle. The officer testified that when he requested the bottle a second time, she handed it to him. *Id.* He determined that the name on the bottle did not match the woman's identification. She later was charged with unlawful possession of a controlled substance. *Id.* at ¶ 16. Thereafter, she filed a suppression motion, challenging the seizure of the bottle. The trial court denied the motion, finding that she voluntarily had consented to the seizure by handing the bottle to the officer. *Id.* at ¶ 31.

{¶ 11} On appeal, this court reversed, reasoning in part:

The trial court did not say that it credited the testimony of Officer Hawley over defendant-appellant's. There are differences relevant to the issue of coercion. The officer testified that he made two requests; defendant-appellant testified to three. She also said that he implied a more difficult and prolonged detention if she failed to cooperate. The officer made no mention of that. Even so, and assuming that the trial court credited the officer's version of those differences, we believe that coercion is portrayed. Defendant-appellant, a female, was confronted by a uniformed police officer

as she sat alone in her car at approximately 10:00 p.m., in a dimly lighted location. The location was not remote, but no other persons were around. She was frightened when the officer appeared and shined his light in her eyes. This was followed by questioning that lasted from between 10 and 15 minutes, to no apparent purpose.

When the officer eventually developed an interest in the pill bottle and asked defendant-appellant to hand it over, she refused. It is reasonable to infer that she refused because the bottle contained evidence that could result in criminal charges against her. That fact supports a finding that her subsequent acquiescence to the officer's renewed demand was involuntary, not a consent that was the product of defendant-appellant's own free will. Stated conversely, existence of those facts, on this record, precludes a finding that the voluntariness of defendant-appellant's "consent" is demonstrated by clear and convincing evidence. * * *

A suspect's refusal to hand over incriminating evidence is not necessarily determinative of coercion. However, it is one factor, and an important factor, in determining whether coercion was applied to obtain it through further demands. Also significant is the subject's vulnerability, the reasonableness of the officer's other conduct, as well as the time of day, location, and proximity of other persons. On the totality of those circumstances, as portrayed by this record, we conclude that the officer seized the pill bottle from defendant-appellant absent her voluntary consent. Therefore, the trial court erred when it denied her motion to suppress on a

contrary finding.

*Id.* at ¶ 41-44.

{¶ 12} Although the facts in *DeCaminada* differ from those in Muncy's case, *DeCaminada* demonstrates how an officer's repeated requests can become coercive and render a defendant's acquiescence involuntary. We find that to be the case here. Two armed officers stood in Muncy's house and accused him, in the presence of his elderly mother who appeared to be in her 80s, of hiding drugs in a locked desk drawer. When Muncy denied having a key or being able to access the drawer, Riegel responded by repeating statements such as "I believe you have drugs in there," "I believe you have the key," "I want you to open it," and "I want you to give me the key." (Doc. # 17 at 2; Tr. at 27, 46). On cross examination, Riegel admitted that he had to repeat these statements "a few" times and that he had been in the house about 10 minutes before Muncy acquiesced. (Tr. at 46). Riegel also admitted never telling Muncy that he had a right to refuse to consent to a search of the desk drawers. (*Id.* at 41-42). Although Riegel was not required to so advise Muncy, a suspect's knowledge of his right to refuse is a relevant consideration. *State v. Barker*, 53 Ohio St.2d 135, 142, 372 N.E.2d 1324 (1978), citing *Schneckloth* at 249. Finally, the trial court was entitled to consider "the possibly vulnerable subjective state of the person who consents." *Schenckloth* at 229. On that issue, the trial court found it reasonable for Muncy "to have been concerned about [his mother's] welfare in the event contraband was found by the police." (Doc. #17 at 4). Although the State insists the officers were not responsible for Muncy's concern about his mother, his subjective state remained relevant to the voluntariness of his consent.[1]

---

[1] In his appellate brief, Muncy additionally contends Riegel (1) claimed he could go out

{¶ 13} Based on the reasoning set forth above, we see no error in the trial court's suppression ruling. The record supports the trial court's finding that Muncy did not voluntarily consent to turning over the key that enabled Riegel to search the locked drawer where drugs were found. With regard to the subsequent statements Muncy made to police, the State's only argument is that the statements were not subject to suppression as "fruit of the poisonous tree" because the search of the locked drawer was lawful. Because we have found that the search of the locked drawer was unlawful, the State's argument about the statements necessarily lacks merit.

{¶ 14} The State's assignment of error is overruled, and the judgment of the Montgomery County Common Pleas Court is affirmed.

. . . . . . . . . . . . .

DONOVAN, P.J., and WELBAUM, J., concur.

Copies mailed to:

Mathias H. Heck
Lynne R. Nothstine
Kristine E. Comunale
Hon. Barbara J. Gorman

---

to his police cruiser and get a warrant, (2) threatened to arrest Muncy and his mother if he had to get a warrant, (3) suggested that no one might go to jail if Muncy handed over the key, and (4) asserted that he was going to get into the locked drawer "one way or another." Although Muncy supported these claims with his own suppression-hearing testimony, the trial court appears to have rejected these aspects of his testimony. As set forth above, the trial court found credible Riegel's claim "that he did not make any threats or promises to the Defendant to obtain the key." (Doc. #17 at 4).